JANUARY TERM, 1864. 35

Weisbrod vs. The Chicago & North-Western Railway Co.

---

WEISBROD VS. THE CHICAGO & NORTH-WESTERN RAILWAY COMPANY.

A husband may act as the agent of his wife in transactions relating to her separate estate, and may execute in her name a conveyance of her land under a power of attorney.

The plat of M's addition to a city, recorded in 1847, showed a street on the *east* side 40 feet in width. The plat of C's addition to the same city, recorded in 1848, showed a street on the *west* side 40 feet in width, which, together with the 40 feet on the east side of M's addition, was represented as constituting one continuous street 80 feet in width. There was nothing on the plat, nor any monument on the land, to indicate that there was any space between the two platted tracts; but there was in fact an intervening strip of 27 feet belonging to M. The whole space of 107 feet has been used as a public street since that time, and lots have been sold on each side with reference to said plats. *Held*, that M and those claiming under him are *estopped* from setting up title beyond the actual center of the street, as against persons who purchased lots on the opposite side of the street, after the recording of said plats, without actual notice of M's title to said strip.

If the original boundary lines had appeared upon the plats, showing that one proprietor owned more of the street than the other, purchasers would be affected with notice from the plats themselves.

In the case of a common highway in the country, a purchaser of land on either side would probably be bound to ascertain the actual division line between it and the land on the opposite side, and could not rely upon any presumption that it was the center of the highway.

APPEAL from the Circuit Court for *Winnebago* County.

Ejectment, for a strip of land lying near the middle of what was commonly known as Broad street in the city of Oshkosh. The plaintiff claimed the premises as part of lot 1, block E and lot 26, block D, in the 2d Addition to said city. The

defendant claimed to occupy and use the premises as the property of one Miller, under a license from him. The grounds upon which the parties severally rested their claims are fully and clearly stated in the second paragraph of the opinion, *infra.* In making out his chain of title to lot 26, block D, the plaintiff offered in evidence the record of a power of attorney from Arabella Crary to Leonard P. Crary, dated June 11th, 1853, and admitted that said Leonard was the husband of said Arabella at the time the instrument was executed; also the record of a warranty deed from Arabella Crary and Leonard P. Crary to the plaintiff, executed in June, 1854, by said Leonard as attorney in fact of said Arabella and for himself; but the evidence was excluded on the ground that a wife could not at that time execute a valid power of attorney to her husband, nor execute a deed by her husband as attorney.

After considerable evidence had been introduced on both sides as to so much of the land in dispute as fronts lot 1, block E, the court instructed the jury, in substance, that if Miller's land included all the west half of Broad street, and extended beyond the center of said street, but did not extend to the east line of the street, so that a strip of land remained between the east line of the Miller purchase and the east line of Broad street, to which Miller had no title, then his quit-claim deed to the plaintiff did not convey to the latter that part of the street lying east of its center and in front of plaintiff's lot; and if the defendant's track was constructed upon the strip so described, the plaintiff could not recover. Verdict and judgment for the defendant.

*Whittemore & Weisbrod,* for appellant.

*M. A. Edmonds,* for respondent:

At common law the deed of conveyance and the power of attorney of a married woman were absolutely void. 2 Greenl. Cruise, 315; 2 Hilliard on Real Prop., 271; *Martin v. Dwelly,* 6 Wend., 12; *Sumner v. Conant,* 10 Vt., 19. Owing to the

unity of person between husband and wife, neither of them could make a grant directly to the other to take effect in possession during the life time of the grantor. 25 N. Y., 329. This was some protection, though slight, to the wife, against the importunities of her husband to place her real estate absolutely at his disposal. The wife could not appoint an attorney for any purpose, and could appear in court only by her next friend or guardian *ad litem.* And in suits concerning her separate property, chancery would not appoint her husband in such capacity, because he could not give a bond to his wife, and there was no way of compelling him to pay over the proceeds which he should get into his own hands. *In re Whitaker*, 4 Johns. Ch., 378. By statute the married woman was authorized to convey by deed, and in some cases without joining with her husband; but no court ever held her conveyance directly to her husband to be good at law. There are cases where equity has upheld such conveyances when it appeared that the wife had received the consideration, and it would be inequitable for her to repudiate the deed. Finally by statute in New York and this state, she has been authorized to convey "in the same manner as though she were unmarried." These words are held by the court of last resort in New York to be insufficient to authorize her to convey directly to her husband, for two reasons: 1. Because the husband's disability to take such a conveyance, arising out of the unity of person between them, was not, either in terms or by implication, removed by the statute. 2. Because such conveyances are against the policy of the law. *White v. Wager,* 25 N. Y., 328. In this case Judge DENIO says: "We should not expect to find in a law passed professedly to shield the property of married women from the control of their husbands, a provision making it more easy for the latter to acquire such control. Beyond all doubt the greatest peril to which the separate estate of the wife is exposed, is her disposition to acquiesce in placing the title to it in the hands of her husband." We have

no statute expressly authorizing a *feme covert* to appoint an attorney; but it is argued that if she may convey her property in the same manner as a *feme sole*, she may convey by attorney. There is force in the argument thus far. But it is also argued that she may appoint her husband. Here the force of the reasoning ceases. For the husband is under the same disability to act as her attorney for the conveyance of her real estate, that disqualifies him from receiving a conveyance of it from her. It is the disability arising out of the unity of person. If the statute has not removed his disability to *take* from her, how can it be argued that it has removed his disability to act as her attorney in disposing of her property, when the reasons for retaining the disability are even more cogent in the latter case than in the former? Independently of all we know of the history of the married woman's act and what led to it in this state, and of the intention of the legislature as expressed in the title of the act, we have in the body of it the most explicit declaration that her property " shall not be subject to the disposal of her husband nor be liable for his debts." Now if it is held that she can by power of attorney empower her husband to dispose of her separate property, the great object of the act is more completely frustrated than by allowing her to convey to him directly; because while it is well known that most wives have such confidence in their husbands and such distrust of their own capacity to do business, that they would readily acquiesce in giving their husbands a *carte blanche* to transact their business matters, dispose of their property and receive and collect the purchase money, there would be a comparative reluctance to conveying to him directly without receiving the consideration in hand. The arguments for the latter course would always be less specious than for the former, and the proposition to convey directly to him without any consideration would naturally arouse suspicion in the mind of any woman possessed of common understanding. Yet both are evils which the common

law provided against by placing both parties under disability to contract with each other. A mere naked power is of course always revocable, but how useless would the right of a wife to revoke be in practice in a case like this. Not until the injury was committed would she have occasion to revoke it. And then what remedy would the law afford her for the recovery of the moneys in the hands of her husband? Again, how useless, practically, would her right to revoke be in view of the influence which the husband exercises over the wife. The law presumes that a *feme covert* acts under compulsion of her husband. So far does this presumption go to relieve her of responsibility. for her acts in his presence, that larcenies and other crimes committed by them jointly are held to be the several crimes of the husband only, and the law excuses her from punishment therefor. So that if it be conceded that such a power of attorney is valid, it might for all practical purposes as well be irrevocable. 2. When land on opposite sides of a highway belongs to different persons, the presumption that each owns to the center of the way may be rebutted by proof to the contrary. Angell on Highways, secs. 313, 314; 1 Phil. Ev., 647–8; Best on Presumption, 241; 3 Kent, 434. Therefore where A and B own lands adjoining, and a street or highway is laid out on the line between them, but wholly on the land of A, he continues to own the fee of the street or highway, and whenever the street or highway is vacated, the absolute title reverts to him. So when Miller and Conklin platted their lands, and Miller left a wider strip for a street than Conklin did, the line of division between them was not thereby changed, and Conklin did not own the fee to the center of the street, but only up to Miller's line; and of course he could convey no more to the plaintiff.—Counsel argued farther that Miller's quitclaim deed to the plaintiff did not convey to him the land in dispute.

*By the Court,* DIXON, C. J. A *feme covert* may at the common law be an attorney of another to make livery to her hus-

band upon a feoffment; and a husband may make such livery to his wife. She may act as the agent or attorney of her husband, and as such, with his consent, bind him by her contract or other act; or she may act as the agent of another in a contract with her own husband. Story on Agency, § 7. If it is no violation of the common law principle of the unity of husband and wife, for the wife to act as the agent or attorney of her husband, the conclusion would seem irresistibly to follow, that it is no infringement of the same principle to allow the husband to act as the agent of the wife in cases where by law she is *sui juris* and capable of acting for herself. At common law, the separate existence of the wife was for many purposes merged in that of the husband, and she could do no act. Incapable of acting for herself, she could not appoint another to act in her stead. Her disability was general, and hence we find no cases in the books of agency in her behalf, either by her husband or another; certainly none by her husband, unless they be some of very recent date, and which have arisen since the enactment of statutes enlarging the rights of married women, and in which the capacity of the husband to act as the agent of his wife seems rather to have been assumed than decided. Thus it will be seen from the report, that it was assumed by the Court of Appeals in *Hauptman v. Catlin*, 20 N. Y., 247, that the husband might act as the agent of his wife in transactions respecting her separate estate. Her separate property was charged in an action at law, under the lien act, upon a contract made by her husband as her agent. The opinion in the case was written by the same learned judge, whose language in *White v. Wager*, 25 N. Y., 328, is quoted by counsel for the respondent to prove that the husband cannot act as such agent. Thus too it was assumed by this court in *Hobby v. The Wisconsin Bank*, 17 Wis., 167. But in neither case was the capacity of the husband to act, or the power of the wife to appoint him, directly raised or discussed. The question passed off *sub silentio*. But as we have already said, there seems

JANUARY TERM, 1864. 41

Weisbrod vs. The Chicago & North-Western Railway Co.

on principle to be no reason to doubt the correctness of the doctrine thus assumed. The disability of the wife has in many respects been removed by statute, and she is now capable of acting not only by herself but by an agent, with no express limitation upon her power of appointment. If the doctrine of unity does not stand in the way, as it seems it cannot, then we see nothing to prevent her making her husband her agent, whenever she chooses to intrust him with the management of her affairs. It is true that the Court of Appeals held in *White v. Wager*, that the statute does not enable the wife to convey land to her husband. It is also true that the statute does not authorize her to receive by gift, grant, &c., from her husband any real or personal property; and yet it would hardly be contended that this limitation upon her power to receive directly, abrogates the common law rule that she may act as the agent of her husband in the sale and disposition of the same property to others. So too at the common law she could not take by grant or gift from her husband; still she could convey to others as his agent. The distinction arises from the inherent difference between a mere power to convey and the conveyance itself. The former is not regarded in the law as a contract, whilst the latter is. Hence a person incapable of contracting may be the donee of a power; and husband and wife, for the purpose of giving and receiving a power either to and from each other or third persons, are to be considered as if no relation of marriage existed between them. For these reasons we are of opinion that the power of attorney from Arabella Crary to her husband, and the deed from her to the plaintiff executed by her husband as her attorney in fact, should have been received in evidence.

Miller's addition to the city of Oshkosh was surveyed and platted, and the plat acknowledged and recorded, in March, 1847. This plat showed a street on the east side thereof, forty feet wide. Conklin's plat, known as the "Second Addition to Oshkosh," was laid out and recorded in April, 1848. This

plat, on the west side thereof, showed a street forty feet wide, which together with the forty feet on the east side of Miller's addition constituted " Broad Street," so called. The two plats together indicated a continuous space dedicated to the public as a street from the east line of lots in Miller's addition to the west line of lots in Conklin's addition, with no intervening ground in the center reserved by the owners, or either of them, for private use, and with nothing to show the real boundary or dividing line between them. It turns out that there was an intervening strip twenty-seven 26-100 feet in width, supposed to have belonged to Miller, lying between the forty feet dedicated by him and that dedicated by Conklin, which was not delineated on either plat; so that " Broad Street," instead of being eighty feet wide, is found upon actual measurement to be one hundred seven 26-100 feet. Improvements commenced upon the street in 1849, and from that time to this it has been held and used by the public as a highway to its present width. The city authorities caused a map of the city to be made in 1853, on which the street was delineated as it then existed and now exists. It was graded, and sidewalks constructed under their direction, in 1855. In August, 1849, the plaintiff, through divers mesne conveyances from Conklin, acquired title to a lot on the east side of the street, and improved and built upon it in the spring of 1850. Miller conveyed the lot directly opposite on the west side of the street to one Papendick in November, 1850. In June, 1851, Miller quitclaimed to the plaintiff the lot on the east side of the street, the title to which the plaintiff had already acquired through Conklin. Some question is made as to the effect of this quitclaim upon the rights of Miller to the strip of land in the center of the street, but as we are of opinion that Miller's title to the center of the street on the east side, had already gone to to the plaintiff, by virtue of the previous acts and conveyances of the original proprietors, a consideration of this question becomes unnecessary. We are of opinion that the plaintiff, by

virtue of his conveyance from Conklin, acquired title to the center of the street as it existed at the time Conklin conveyed. In other words, we think Miller, after what had occurred in the making and recording of the plats, is estopped from asserting title to the soil beyond the center opposite his lots, as against Conklin's grantees or those holding under them, who purchased without actual notice of the true state of the title to the street. The well settled presumption in all such cases is, that the proprietor of the adjoining lot owns to the center of the street, and that the purchaser takes to the center by virtue of a conveyance of the lot. People act upon this presumption in buying and selling. The right of soil in the street is a valuable right to the owner of the adjacent lot, as the facts of this case abundantly show. It is true that this is but a presumption, and ordinarily liable to be defeated by proof that the right of soil is altogether in one or the other of the adjoining proprietors, or that one has a greater or less interest than the other; but in a case like this, where the proprietors lay out their lands into city lots, acknowledging and recording their plats with nothing upon them to indictae the original boundaries, thus in fact extinguishing such boundaries, and intending that the lots shall be bought and sold by the plats and the plats alone, or where the plats indicate the center of a street as the line of original division, we think the presumption should become conclusive in favor of grantees and purchasers from either proprietor without actual notice of the rights of the other. Plats, under the statute, are instruments of equal solemnity with deeds; they are acknowledged and recorded in the same manner; and purchasers are supposed to look only to them to ascertain the extent of the rights and titles of the owners of lots. With nothing upon the plats to indicate that one proprietor has a greater interest in the soil of the streets than the other, nothing to warn the purchaser, and with no monuments upon the land itself, the estoppel created by making, recording and permitting the sale of lots ac-

cording to the plats ought to be as strong, nay, even stronger, than if the proprietor of the whole or the greater part of the soil of the streets, being present, should, without notice to the purchaser or claim of title in himself, permit the adjoining proprietor to sell upon a representation that such purchaser would take title to the center of the street. The plats are a public recorded representation that the soil of the streets, subject to the public easement, belongs to the proprietors of the adjacent lots, and that the center of the street is the real line of division between them ; and if by mistake or other cause the streets are in fact wider than the proprietors intended, the application of the rule must still be the same. By making and recording the plats, they make the center line of the street the line of division of lots as to purchasers without actual notice; and each proprietor authorizes the other, as to lots owned by that other, to sell as the owner of one half of the soil of the streets fronting upon such lots. If the original boundary lines appeared upon the plats, showing that one proprietor owned more of the soil of a street than the other, or if it were the case of a common highway in the country, the question presented would differ materially from that under consideration. In the former case the purchaser would be affected with notice from the plats themselves ; and in the latter he would probably be bound to ascertain the division lines regardless of the easement by highway. But upon the facts before us, we are inclined to think that the plaintiff took to the center of the street as it existed at the time of the conveyance from Conklin, and that the cause should have been submitted to the jury upon the principles above laid down.

The judgment is therefore reversed, and the cause remanded for further proceedings according to law.